James W. NEWTON, Jr., dba Janew Music, Plaintiff–Appellant,

v.

Michael DIAMOND; Adam Horowitz; Adam Yauch, dba Beastie Boys; Capitol Records, Inc., a Delaware Corporation; Grand Royal Records, Inc., a California Corporation; Universal Polygram International Publishing, Inc., a Delaware Corporation; Brooklyn Dust Music, an entity of unknown origin; Mario Caldato, Jr., an individual; Janus Films, LLC, a New York Limited Liability Company; Criterion Collection, a California Partnership; Voyager Publishing Company, Inc., a Delaware Corporation; Sony Music Entertainment Group, a Delaware Corporation; BMG Direct Marketing, Inc., a Delaware Corporation; The Columbia House Company, an entity of unknown origin, Defendants–Appellees.

No. 02–55983.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 7, 2003.

Filed Nov. 4, 2003.

Amended Nov. 9, 2004.

Alan Korn, Law Offices of Alan Korn, Berkeley, CA, for the plaintiff-appellant.

Adam F. Streisand and David C. Nelson, Loeb & Loeb, LLP, and Barry E. Mallen, Manatt, Phelps & Phillips, LLP, Los Angeles, CA, for the defendants-appellees.

Todd M. Gascon, Law Offices of Todd M. Gascon, and Sarah Sevier Farnbach, Phillips & Erlewin, LLP, San Francisco, CA, for the amici curiae.

Before SCHROEDER, Chief Judge, THOMPSON and GRABER, Circuit Judges.

Opinion by Chief Judge SCHROEDER; Dissent by Judge GRABER.

ORDER AMENDING OPINION AND DENYING REHEARING AND AMENDED OPINION AND AMENDED DISSENT

## ORDER

The Opinion filed on November 4, 2003, is hereby amended. The clerk shall file the attached Amended Opinion.

With this Amended Opinion, the panel has voted unanimously to deny the petition for panel rehearing and petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc and no active judge has requested a vote on whether to hear the matter en banc. Fed. R.App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are DENIED. No further petitions for rehearing will be entertained.

## OPINION

SCHROEDER, Chief Judge.

This appeal raises the difficult and important issue of whether the incorporation of a short segment of a musical recording into a new musical recording, i.e., the practice of "sampling," requires a license to use both the performance and the composition of the original recording. The particular sample in this case consists of a six-second, three-note segment of a performance of one of his own compositions by plaintiff, and accomplished jazz flutist, James W. Newton. The defendants, the performers who did the sampling, are the members of the musical group Beastie Boys. They obtained a license to sample the sound recording of Newton's copyrighted performance, but they did not obtain a license to use Newton's underlying composition, which is also copyrighted.

The district court granted summary judgment to the defendants. In a scholarly opinion, it held that no license to the underlying composition was required because, as a matter of law, the notes in question—C—D flat—C, over a held C note—lacked sufficient originality to merit copyright protection. *Newton v. Diamond,* 204 F.Supp.2d 1244, 1256 (C.D.Cal. 2002). The district court also held that even if the sampled segment of the composition were original, Beastie Boys' use of a brief segment of the sound recording of "Choir" was a de minimis use of the "Choir" composition and therefore was not actionable. *Id.* at 1259. We affirm on the ground that the use was de minimis.

## Background and Procedural History

The plaintiff and appellant in this case, James W. Newton, is an accomplished avant-garde jazz flutist and composer. In 1978, he composed the song "Choir," a piece for flute and voice intended to incorporate elements of African–American gospel music, Japanese ceremonial court music, traditional African music, and classical music, among others. According to Newton, the song was inspired by his earliest memory of music, watching four women singing in a church in rural Arkansas. In 1981, Newton performed and recorded "Choir" and licensed all rights in the sound recording to ECM Records for $5000.[1] The license covered only the sound recording, and it is undisputed that Newton retained all rights to the composition of "Choir." Sound recordings and their underlying compositions are separate works with their own distinct copyrights. 17 U.S.C. § 102(a)(2), (7).

The defendants and appellees include the members of the rap and hip-hop group Beastie Boys, and their business associates. In 1992, Beastie Boys obtained a license from ECM Records to use portions of the sound recording of "Choir" in various renditions of their song "Pass the Mic"

in exchange for a one-time fee of $1000.[2] Beastie Boys did not obtain a license from Newton to use the underlying composition.

The portion of the composition at issue consists of three notes, C—D flat—C, sung over a background C note played on the flute. The score to "Choir" also indicates that the entire song should be played in a "largo/senza-misura" tempo, meaning "slowly/without-measure." The parties disagree about whether two additional elements appear in the score. First, Newton argues that the score contains an instruction that requires overblowing the background C note that is played on the flute. Second, Newton argues that multiphonics are part of the composition because they are necessarily created when a performer follows the instructions on the score to simultaneously play the flute note and sing the vocal notes. Because we review the district court's grant of summary judgment to the Beastie Boys, we must construe the evidence in Newton's favor. We therefore assume that these two elements are part of the "Choir" composition. As we will discuss more fully below, there are other elements that are part of Newton's performance that was captured in the

1. In relevant part, the license reads as follows:

   1) [Newton] herewith grants, transfers and assigns to ECM without limitations and restrictions whatsoever the exclusive rights to record his performances and to exploit these recordings in perpetuity throughout the world in any manner whatsoever.
   . . . .
   3) The grant of rights according to section 1) especially, includes the rights to manufacture in quantity [sic], to distribute, to license to others, as well as to perform the recordings in public and to utilize it in radio, TV, or in other ways without any restrictions.

2. In relevant part, the license reads as follows:

   [ECM Records], as owner of the applicable sound recording rights, including but not

limited to recording, reproduction, synchronization and performing rights, grants to Beastie Boys, its licensees, assigns, employees and agents (the "Licensed Parties"), the irrevocable non-exclusive license and right to copy portions (if any) of the sound recording entitled "Choir" performed by James Newton (the "Sample"); to embody the sample in some or all versions of the selection entitled "Pass the Mic" by the Beastie Boys (all versions of "Pass the Mic" which contain the Sample are referred to as the "Selection"); to reproduce, distribute and otherwise exploit the Sample as part of the Selection in all media, whether now known or hereinafter developed, including, without limitation, all record formats throughout the world in perpetuity.

sound recording, but that do not appear in the score.

The dispute between Newton and Beastie Boys centers around the copyright implications of the practice of sampling, a practice now common to many types of popular music. Sampling entails the incorporation of short segments of prior sound recordings into new recordings. The practice originated in Jamaica in the 1960s, when disc jockeys (DJs) used portable sound systems to mix segments of prior recordings into new mixes, which they would overlay with chanted or "scatted" vocals. *See* Robert M. Szymanski, *Audio Pasitiche: Digital Sampling, Intermediate Copying, Fair Use*, 3 U.C.L.A. Ent. L. Rev. 271, 277 (Spring 1996). Sampling migrated to the United States and developed throughout the 1970s, using the analog technologies of the time. *Id.* The digital sampling involved here developed in the early 1980s with the advent of digital synthesizers having MIDI (Musical Instrument Digital Interface) keyboard controls. These digital instruments allowed artists digitally to manipulate and combine sampled sounds, expanding the range of possibilities for the use of pre-recorded music. Whereas analog devices limited artists to "scratching" vinyl records and "cutting" back and forth between different sound recordings, digital technology allowed artists to slow down, speed up, combine, and otherwise alter the samples. *See id.*

Pursuant to their license from ECM Records, Beastie Boys digitally sampled the opening six seconds of Newton's sound recording of "Choir." Beastie Boys repeated or "looped" this six-second sample as a background element throughout "Pass the Mic," so that it appears over forty times in various renditions of the song. In addition to the version of "Pass the Mic" released on their 1992 album, "Check Your Head," Beastie Boys included the "Choir" sample in two remixes, "Dub the Mic" and

"Pass the Mic (Pt. 2, Skills to Pay the Bills)." It is unclear whether the sample was altered or manipulated, though Beastie Boys' sound engineer stated that alterations of tone, pitch, and rhythm are commonplace, and Newton maintains that the pitch was lowered slightly.

Newton filed the instant action in federal court on May 9, 2000, alleging violations of his copyright in the underlying composition, as well as Lanham Act violations for misappropriation and reverse passing off. The district court dismissed Newton's Lanham Act claims on September 12, 2000, and granted summary judgment in favor of Beastie Boys on the copyright claims on May 21, 2002. *Newton v. Diamond*, 204 F.Supp.2d 1244 (C.D.Cal.2002). The district court held that the three-note segment of the "Choir" composition could not be copyrighted because, as a matter of law, it lacked the requisite originality. 204 F.Supp.2d at 1256. The court also concluded that even if the segment were copyrightable, Beastie Boys' use of the work was de minimis and therefore not actionable. *Id.* at 1259. Newton appealed.

**Whether Defendants' Use was De Minimis**

■■■ We may affirm the grant of summary judgment on any basis supported by the record and need not reach each ground relied upon by the district court. *See Venetian Casino Resort L.L.C. v. Local Joint Executive Bd. of Las Vegas*, 257 F.3d 937, 941 (9th Cir.2001), *cert. denied*, 535 U.S. 905, 122 S.Ct. 1204, 152 L.Ed.2d 142 (2002). Assuming that the sampled segment of the composition was sufficiently original to merit copyright protection, we nevertheless affirm on the ground that Beastie Boys' use was de minimis and therefore not actionable.

■■■ For an unauthorized use of a copyrighted work to be actionable, the use must be significant enough to constitute

infringement. *See Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 74–75 (2d Cir.1997). This means that even where the fact of copying is conceded, no legal consequences will follow from that fact unless the copying is substantial. *See Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir.1992); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[A], at 13–30.2. The principle that trivial copying does not constitute actionable infringement has long been a part of copyright law. Indeed, as Judge Learned Hand observed over 80 years ago: "Even where there is some copying, that fact is not conclusive of infringement. Some copying is permitted. In addition to copying, it must be shown that this has been done to an unfair extent." *West Publ'g Co. v. Edward Thompson Co.*, 169 F. 833, 861 (E.D.N.Y.1909). This principle reflects the legal maxim, *de minimis non curatlex* (often rendered as, "the law does not concern itself with trifles"). *See Ringgold*, 126 F.3d at 74–75.

■ A leading case on de minimis infringement in our circuit is *Fisher v. Dees*, 794 F.2d 432 (9th Cir.1986), where we observed that a use is de minimis only if the average audience would not recognize the appropriation. *See id.* at 434 n. 2 ("[A] taking is considered de minimis only if it is so meager and fragmentary that the average audience would not recognize the appropriation."). This observation reflects the relationship between the de minimis maxim and the general test for substantial similarity, which also looks to the response of the average audience, or ordinary observer, to determine whether a use is infringing. *See, e.g., Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002); *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132 (2d Cir. 1998) ("Two works are substantially similar where 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard

[the] aesthetic appeal [of the two works] as the same.' " (quoting *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir.1992) (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (L. Hand, J.)))). To say that a use is de minimis because no audience would recognize the appropriation is thus to say that the use is not sufficiently significant.

On the facts of *Fisher*, this court rejected the de minimis defense because the copying was substantial: the defendant had appropriated the main theme and lyrics of the plaintiff's song, both of which were easily recognizable in the defendant's parody. 794 F.2d at 434 & n. 2. Specifically, the defendant copied six of the thirty-eight bars to the 1950s standard, "When Sunny Gets Blue," to make the parody, "When Sonny Sniffs Glue," and paralleled the original lyrics with only minor variations. *Id.* However, despite the works' substantial similarities, we held that the use was nevertheless non-infringing because, as a parody, it was "fair use" under 17 U.S.C. § 107. *Id.* at 440. We explained that the defendant's successful fair use defense precluded a finding that the use was insubstantial or unrecognizable because "the parodist must appropriate a substantial enough portion of[the original] to evoke recognition." *Id.* at 435 n. 2.

This case involves not only use of a composition, as was the case in *Fisher*, but also use of a sound recording of a particular performance of that composition. Because the defendants were authorized to use the sound recording, our inquiry is confined to whether the unauthorized use of the composition itself was substantial enough to sustain an infringement claim. Therefore, we may consider only Beastie Boys' appropriation of the song's compositional elements and must remove from consideration all the elements unique to Newton's performance. Stated another

way, we must "filter out" the licensed elements of the sound recording to get down to the unlicensed elements of the composition, as the composition is the sole basis for Newton's infringement claim. *See Cavalier*, 297 F.3d at 822; *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir.1994).

In filtering out the unique performance elements from consideration, and separating them from those found in the composition, we find substantial assistance in the testimony of Newton's own experts. Because we are reviewing a grant of summary judgment in favor of the Beastie Boys, we must view the evidence in the light most favorable to Newton and affirm only if there is no genuine issue of material fact. Newton's experts, however, reveal the extent to which the sound recording of "Choir" is the product of Newton's highly developed performance techniques, rather than the result of a generic rendition of the composition. As a general matter, according to Newton's expert Dr. Christopher Dobrian, "[t]he contribution of the performer is often so great that s/he in fact provides as much musical content as the composer." This is particularly true with works like "Choir," given the improvisational nature of jazz performance and the minimal scoring of the composition. Indeed, as Newton's expert Dr. Oliver Wilson explained:

> [T]he copyrighted score of "Choir", as is the custom in scores written in the jazz tradition, does not contain indications for all of the musical subtleties that it is assumed the performer-composer of the work will make in the work's performance. The function of the score is more mnemonic in intention than prescriptive.

And it is clear that Newton goes beyond the score in his performance. For example, Dr. Dobrian declared that "Mr. Newton blows and sings in such a way as to emphasize the upper partials of the flute's complex harmonic tone, [although] such a modification of tone color is not explicitly requested in the score." Dr. Dobrian also concludes that Newton "uses breath control to modify the timbre of the sustained flute note rather extremely" and "uses portamento to glide expressively from one pitch to another in the vocal part." Dr. Dobrian concedes that these elements do not appear in the score, and that they are part of Newton's performance of the piece.

■ A crucial problem with the testimony of Newton's experts is that they continually refer to the "sound" produced by the "Newton technique." A sound is protected by copyright law only when it is "fixed in a tangible medium." 17 U.S.C. § 102(a). Here, the only time any sound was fixed in a tangible medium was when a particular performance was recorded.

Newton licensed the recording at issue to ECM Records over twenty years ago, and ECM Records in turn licensed the interest in the recording to the Beastie Boys. Newton's copyright extends only to the elements that he fixed in a tangible medium—those that he wrote on the score. Thus, regardless of whether the average audience might recognize the "Newton technique" at work in the sampled sound recording, those performance elements are beyond consideration in Newton's claim for infringement of his copyright in the underlying composition.

Once we have isolated the basis of Newton's infringement action—the "Choir" composition, devoid of the unique performance elements found only in the sound recording—we turn to the nub of our inquiry: whether Beastie Boys' unauthorized use of the composition, as opposed to their authorized use of the sound recording, was substantial enough to sustain an infringement action. In answering that question, we must distinguish between whether there is a high enough degree of similarity

between the works to establish copying, and whether that copying is substantial enough to constitute infringement. *Cf. Ringgold,* 126 F.3d at 74–75; 4 Nimmer § 13.03[A][2], at 13–45. The practice of music sampling will often present cases where the degree of similarity is high. Indeed, unless the sample has been altered or digitally manipulated, it will be identical to the sampled portion of the original recording. Yet as Nimmer explains, "[if] the similarity is only as to nonessential matters, then a finding of no substantial similarity should result." 4 Nimmer § 13.03[A][2], at 13–48; *cf. Warner Bros. v. Am. Broad. Cos.,* 720 F.2d 231, 242 (2d Cir.1983). This reflects the principle that the substantiality requirement applies throughout the law of copyright, including cases of music sampling, even where there is a high degree of similarity.

The high degree of similarity between the works here (i.e., "Pass the Mic" and "Choir"), but the limited scope of the copying, place Newton's claim for infringement into the class of cases that allege what Nimmer refers to as "fragmented literal similarity." 4 Nimmer § 13.03[A][2], at 13–45. Fragmented literal similarity exists where the defendant copies a portion of the plaintiff's work exactly or nearly exactly, without appropriating the work's overall essence or structure. *Id.* Because the degree of similarity is high in such cases, the dispositive question is whether the copying goes to trivial or substantial elements. Substantiality is measured by considering the qualitative and quantitative significance of the copied portion in relation to the plaintiff's work as a whole. *See, e.g., Worth v. Selchow & Righter Co.,* 827 F.2d 569, 570 n. 1 (9th Cir.1987) ("[T]he relevant inquiry is whether a substantial portion of the protectable material in the *plaintiff's* work was appropriated—not whether a substantial portion of *defendant's* work was derived from plaintiff's work."); *Jarvis v. A & M Records,* 827 F.Supp. 282, 289–90 (D.N.J.1993); 4 Nimmer § 13.03[A][2], at 13–47 to 48 & n. 97. This focus on the sample's relation to the plaintiff's work as a whole embodies the fundamental question in any infringement action, as expressed more than 150 years ago by Justice Story: whether "so much is taken[ ] that the value of the original is sensibly diminished, or the labors of the original author are substantially to an injurious extent appropriated by another." *Folsom v. Marsh,* 9 F.Cas. 342, 348 (C.C.D.Mass.1841) (No. 4901). Courts also focus on the relationship to the plaintiff's work because a contrary rule that measured the significance of the copied segment in the defendant's work would allow an unscrupulous defendant to copy large or qualitatively significant portions of another's work and escape liability by burying them beneath non-infringing material in the defendant's own work, even where the average audience might recognize the appropriation. *Cf. Sheldon v. Metro–Goldwyn Pictures Corp.,* 81 F.2d 49, 56 (2d Cir.1936) ("[I]t is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate."). Thus, as the district court properly concluded, the fact that Beastie Boys "looped" the sample throughout "Pass the Mic" is irrelevant in weighing the sample's qualitative and quantitative significance. *See Newton,* 204 F.Supp.2d at 1257.

On the undisputed facts of this record, no reasonable juror could find the sampled portion of the composition to be a quantitatively or qualitatively significant portion of the composition as a whole. Quantitatively, the three-note sequence appears only once in Newton's composition. It is difficult to measure the precise relationship between this segment and the composition as a whole, because the score calls for between 180 and 270 seconds of improvisation. When played, however, the segment

lasts six seconds and is roughly two percent of the four-and-a-half-minute "Choir" sound recording licensed by Beastie Boys. Qualitatively, this section of the composition is no more significant than any other section. Indeed, with the exception of two notes, the entirety of the scored portions of "Choir" consist of notes separated by whole and half-steps from their neighbors and is played with the same technique of singing and playing the flute simultaneously; the remainder of the composition calls for sections of improvisation that range between 90 and 180 seconds in length.

The Beastie Boys' expert, Dr. Lawrence Ferrara, concludes that the compositional elements of the sampled section do not represent the heart or the hook of the "Choir" composition, but rather are "simple, minimal and insignificant." The sampled section may be representative of the scored portions of the composition as Newton's expert's contend. Newton has failed to offer any evidence, however, to rebut Dr. Ferrara's testimony and to create a triable issue of fact on the key question, which is whether the sampled section is a qualitatively significant portion of the "Choir" composition as a whole. Instead, Newton's experts emphasize the uniqueness of the "Newton technique," which is found throughout the "Choir" composition and in Newton's other work.

Newton nevertheless maintains that the testimony of his experts creates a genuine issue of material fact on the substantiality of the copying. To the extent the expert testimony is relevant, it is not helpful to Newton. On the key question of whether the sample is quantitatively or qualitatively significant in relation to the composition as a whole, his experts are either silent or fail to distinguish between the sound recording, which was licensed, and the composition, which was not. Moreover, their testimony on the composition does not contain anything from which a reasonable jury

could infer the segment's significance in relation to the composition as a whole. In contrast, Dr. Ferrara stated that the sampled excerpt from the "Choir" composition "is merely a common, trite, and generic three-note sequence, which lacks any distinct melodic, harmonic, rhythmic or structural elements." He described the sequence as "a common building block tool" that "has been used over and over again by major composers in the 20th century, particularly in the '60s and '70s, just prior to James Newton's usage."

Because Newton conceded that "Choir" and "Pass the Mic" "are substantially dissimilar in concept and feel, that is, in [their] overall thrust and meaning" and failed to offer any evidence to rebut Dr. Ferrara's testimony that the sampled section is not a quantitatively or qualitatively significant portion of the "Choir" composition, the Beastie Boys are entitled to prevail on summary judgment. On the undisputed facts of this case, we conclude that an average audience would not discern Newton's hand as a composer, apart from his talent as a performer, from Beastie Boys' use of the sample. The copying was not significant enough to constitute infringement. Beastie Boys' use of the "Choir" composition was de minimis. There is no genuine issue of material fact, and the grant of summary judgment was appropriate.

**Conclusion**

Because Beastie Boys' use of the sound recording was authorized, the sole basis of Newton's infringement action is his remaining copyright interest in the "Choir" composition. We hold that Beastie Boys' use of a brief segment of that composition, consisting of three notes separated by a half-step over a background C note, is not sufficient to sustain a claim for infringement of Newton's copyright in the composition "Choir". We affirm the district

court's grant of summary judgment on the ground that Beastie Boys' use of the composition was de minimis and therefore not actionable.

AFFIRMED.

GRABER, Circuit Judge, dissenting:

I respectfully dissent. The majority has laid out correctly the legal principles that apply in this case, and I agree with the majority's assumption that the sampled portion of "Choir" qualifies as "original" and therefore is copyrightable. Maj. op. at 1192. However, on the record before us, a finder of fact reasonably could find that Beastie Boys' use of the sampled material was not de minimis. Therefore, summary judgment is inappropriate.

As the majority observes, a use is de minimis only if an average audience would not recognize the appropriation. *Fisher v. Dees*, 794 F.2d 432, 434 n. 2 (9th Cir.1986). The majority is correct that James Newton's considerable skill adds many recognizable features to the performance sampled by Beastie Boys. Even after those features are "filtered out," however, the composition, standing alone, is distinctive enough for a fact-finder reasonably to conclude that an average audience would recognize the appropriation of the sampled segment and that Beastie Boys' use was therefore not de minimis.

Newton has presented evidence that the compositional elements of "Choir" are so compositionally distinct that a reasonable listener would recognize the sampled segment even if it were performed by the featured flautist of a middle school orchestra. It is useful to begin by observing that the majority's references to the sampled segment of "Choir" as a "3 note-sequence"[1] are overly simplified. The sampled segment is actually a three-note sequence

sung above a fingered held C note, for a total of four separate tones.[2] Even passages with relatively few notes may be qualitatively significant. The opening melody of Beethoven's Fifth Symphony is relatively simple and features only four notes, but it certainly is compositionally distinctive and recognizable.

The majority, while citing the correct standard of review, fails fully to apply it. First, the majority usurps the function of the fact-finder by weighing the opinions of the various experts and emphasizing some parts of their testimony over others. Maj. op. at 1194–95, 1196. The majority also fails to interpret the evidence in Newton's favor when, for example, it asserts that Newton's experts failed to distinguish between the sound recording and the composition. *Id.* at 1196. To the contrary, Newton presented expert evidence that the composition *alone* is distinctive and recognizable.

First, Newton offered a letter from Professor Olly Wilson of the University of California at Berkeley. Professor Wilson acknowledges that much of the distinctiveness of the sampled material is due to Newton's performance and that the copyrighted score does not fully convey the quality of the piece as performed. Nevertheless, Professor Wilson concludes that the score

> clearly indicates that the performer will simultaneously sing and finger specific pitches, gives a sense of the rhythm of the piece, and also provides the general structure of this section of the piece. Hence, in my opinion, the digital sample of the performance ... is clearly a realization of the musical score filed with the copyright office.

Second, Newton presented a letter from Professor Christopher Dobrian of the Uni-

---

1. Maj. op. at 1190, 1195.

2. The sampled segment of the composition is

scored as shown in the Appendix.

versity of California, Irvine, which concludes:

> Applying traditional analysis to this brief excerpt from Newton's "Choir"—i.e., focusing solely on the notated pitches—a theorist could conclude (erroneously, in my opinion) that the excerpt contains an insignificant amount of information because it contains a simple "neighboring-tone" figure: C to D-flat and back to C.... If, on the other hand, one considers the special playing technique *described in the score* (holding one fingered note constant while singing the other pitches) and the resultant complex, expressive effect that results, it is clear that the "unique expression" of this excerpt is not solely in the pitch choices, but is actually in those particular pitches performed in that particular way on that instrument. These components in this particular combination are not found anywhere else in the notated music literature, and they are *unique and distinctive* in their sonic/musical result.

(Emphasis added.)

Professor Dobrian is not talking about Newton's performance of the sampled portion. Rather, he is speaking of the distinctiveness of the underlying composition. The "playing technique" is not a matter of personal performance, but is a built-in feature of the score itself. In essence, Dobrian is stating that *any* flautist's performance of the sampled segment would be distinctive and recognizable, because the score itself is distinctive and recognizable.

The majority, then, reads the record selectively when it states that Newton failed to offer sufficient evidence that the sampled material is qualitatively significant. In fact, Newton presented evidence, as described above, to show that an average and reasonable listener would recognize Beastie Boys' appropriation of the *composition* of the sampled material.[3]

The majority also asserts that Newton failed to offer evidence to rebut Beastie Boys' expert on the question whether the sampled section of "Choir" is qualitatively significant. Maj. op. at 1196. Again, the majority improperly discounts, or improperly interprets, Dr. Dobrian's unequivocal description of the sampled passage: "These components in this particular combination are not found anywhere else in the notated music literature, and they are unique and distinctive in their sonic/musical result." A fact-finder would be entitled to find either that the sampled passage is trivial and trite (Beastie Boys' expert) or, instead, that it is "unique and distinctive" in the musical literature (Newton's expert).

Because Newton has presented evidence establishing that reasonable ears differ over the qualitative significance of the composition of the sampled material, summary judgment is inappropriate in this case. Newton should be allowed to present his claims of infringement to a fact-finder. I therefore dissent from the majority's conclusion to the contrary.

---

**3.** Because Newton has established that a fact-finder reasonably could find that the sampled portion of "Choir" is qualitatively significant, we need not address the question of the portion's *quantitative* significance. *See Worth v. Selchow & Righter Co.,* 827 F.2d 569, 570 n. 1 (9th Cir.1987) (noting that "a determination of the qualitative importance of the material to the plaintiff's work is more significant than a quantitative calculation of the portion allegedly appropriated by the defendant").